FILED
COURT OF APPEALS
DIVISION II

2013 APR 30 AM 8: 34

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42397-9-II |
| Respondent, | |
| v. | |
| CHERYL E. DANCER, | PUBLISHED OPINION |
| Appellant. | |

PENOYAR, J. — At a bench trial on stipulated facts, the trial court found Cheryl Dancer guilty of one count of unlawful possession of methamphetamine. Dancer appeals, arguing that her consent allowing an officer to enter and search her home was not voluntary and that the officer should have given her *Ferrier*[1] warnings before asking to search her home. Because *Ferrier* warnings are not required when officers advise an occupant that they wish to obtain consent to search for a person reasonably suspected to be on the premises and because substantial evidence supports the trial court's finding that Dancer voluntarily consented to police entry and search for an identified person, the trial court properly considered the evidence seized during the search. We affirm.

FACTS

On June 20, 2010, at 12:15 A.M., Bremerton Police Officer Aaron Elton arrived at a 7-Eleven in response to a domestic violence report. The victim reported that her boyfriend, Sean Johnson, had assaulted her. The victim also reported that the couple's children were either at their shared residence or possibly at their next door neighbor, Dancer's, home.

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

Elton searched for Johnson at the couple's residence but did not locate him there. The police then used a K-9 unit to track Johnson. The dog led officers to the back of Dancer's home.

Elton knocked on Dancer's front door, and Dancer answered. As the two spoke, Elton was on the porch and Dancer remained in her doorway. Dancer confirmed that the children were in her home, but she denied Johnson's presence. Dancer also said she had observed Johnson leaving and indicated the direction he went.

Elton asked Dancer if he could enter her home to search for Johnson. Elton testified that Dancer was not a suspect in any crime but that he was unsure of Dancer and Johnson's relationship and wanted to search for Johnson inside Dancer's home. According to Elton, he did not provide Miranda[2] or Ferrier warnings because he was not searching for evidence or attempting to avoid obtaining a search warrant.

Dancer gave Elton permission to enter her home. Elton did not open any drawers or cabinets and confined his search to areas of the home where a person might hide, including rooms and closets. Elton discovered a bedroom locked from the outside. He asked permission to enter the room, and Dancer unlocked the door. In the bedroom, Elton saw a glass methamphetamine pipe and baggies of methamphetamine in plain sight, which he collected. Dancer admitted owning the items. Elton did not arrest Dancer at that time; he continued to actively investigate the domestic violence incident and search for Johnson. Johnson was not in Dancer's home.

Based on the methamphetamine Elton found, the State charged Dancer with one count of unlawful possession of methamphetamine. Before trial, Dancer moved to suppress all evidence, arguing that the evidence was the product of an unlawful warrantless search of her home in

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

violation of state and federal constitutional protections. The trial court denied Dancer's motion, concluding that "[t]he lack of *Ferrier* warnings is not fatal to the consent that was given by the Defendant." Clerk's Papers (CP) at 60-61.

The case went to trial on stipulated facts. The trial court found Dancer guilty and sentenced her to 240 hours of community service. Dancer appeals.

## ANALYSIS

Dancer argues that officers violated her state and federal constitutional protections by entering and searching her home without a warrant. Specifically, Dancer argues that warrantless entry was unlawful because (1) police failed to provide *Ferrier* warnings when they asked to enter and search her home, vitiating her consent, and (2) the evidence does not support a finding that Dancer voluntarily consented to a warrantless search. Because the *Ferrier* rule does not apply where police seek consent to conduct a warrantless search for a person whom the police have reasonable suspicion to believe is on the premises and because substantial evidence supports the trial court's finding that Dancer voluntarily consented to a warrantless search of her home, we affirm.

I.  STANDARD OF REVIEW

When reviewing a trial court's denial of a suppression motion, we review findings of fact for substantial evidence. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding. *Hill*, 123 Wn.2d at 644. Any unchallenged findings of fact are verities on appeal. *Hill*, 123 Wn.2d at 644. We review de novo whether a trial court's conclusions of law are properly derived from the findings of fact. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012):

3

II.   THE *FERRIER* REQUIREMENT

Dancer first argues that Elton's warrantless entry violated article I, section 7 of the Washington Constitution because Elton did not provide *Ferrier* warnings before asking for her consent to enter and search for Johnson and, thus, her consent was not truly voluntary. Essentially, Dancer argues that police are always required to provide *Ferrier* warnings before obtaining consent to enter a home or conduct a warrantless search. We hold that (1) Elton reasonably suspected that Johnson was in Dancer's home and (2) Elton obtained Dancer's consent to enter her home and search for Johnson after informing Dancer that he wished to search for a crime suspect, thus, (3) no *Ferrier* warnings were required. We affirm the trial court's denial of Dancer's motion to suppress evidence seized from her home.

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The right to privacy under article I, section 7 includes the right to be free from warrantless searches, which are "'unreasonable per se.'" *State v. Khounvichai*, 149 Wn.2d 557, 562, 69 P.3d 862 (2003) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). One exception to the search warrant requirement is consent, which the State bears the burden of establishing. *Khounvichai*, 149 Wn.2d at 562.

In *Ferrier*, police officers suspected a marijuana grow operation was located at a private residence. 136 Wn.2d at 106. Recognizing that they lacked probable cause to obtain a search warrant, the officers decided to conduct a procedure referred to as a "knock and talk."[3] *Ferrier*, 136 Wn.2d at 106, 107. The officers obtained consent to enter the residence and, once inside, revealed their suspicion and sought consent to search the home. *Ferrier*, 136 Wn.2d at 107, 108. The resident signed a written consent form, but the officers did not inform her that she had a right to refuse to consent to allow their entry, restrict the scope of the entry, or terminate it at any time. *Ferrier*, 136 Wn.2d at 107, 108.

Our Supreme Court held that the consent given in *Ferrier* was not truly voluntary absent warnings that the resident could refuse to consent to a search. The court recognized that any police request for consent to conduct a warrantless search is inherently coercive to some degree:

> [W]e believe that the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Ferrier*, 136 Wn.2d at 115. The *Ferrier* court noted that, "unlike a search warrant, a search

---

[3] The Supreme Court defines "knock and talk" procedures as the following:

> In a "knock and talk" procedure, not having obtained a search warrant, police officers proceed to premises where *they believe contraband will be found*. Once there they knock on the door and talk with the resident, asking if they may enter. *After being allowed to enter*, the officers then explain why they are there, that they have no search warrant, and ask permission to search the premises.

*State v. Bustamante-Davila*, 138 Wn.2d 964, 976-77, 983 P.2d 590 (1999) (emphasis added) (footnotes omitted).

resulting from a knock and talk need not be supported by probable cause, or even reasonable suspicion." 136 Wn.2d at 118. Thus, the court held that "article I, section 7 is violated whenever the authorities[ ] fail to inform home dwellers of their right to refuse consent to a warrantless search." *Ferrier*, 136 Wn.2d at 118. Standing alone, this broad language seems to support Dancer's arguments. However, later cases have narrowed the circumstances in which police are required to give *Ferrier* warnings when asking for consent to enter a home.

For example, in *Bustamante-Davila*, 138 Wn.2d at 967-68, local law enforcement officers accompanied an Immigration and Naturalization Service (INS) agent to Bustamante-Davila's home based on a reasonable belief that he was subject to deportation under an immigration judge's "removal order." The INS agent asked Bustamante-Davila for consent to enter the home and he allowed them to enter without objection. *Bustamante-Davila*, 138 Wn.2d at 981. When they entered Bustamante-Davila's home, the INS agent and a Longview police officer saw an illegally possessed rifle in plain view. *Bustamante-Davila*, 138 Wn.2d at 969. After the trial court denied his motion to suppress the evidence seized from his home, Bustamante-Davila was convicted for second degree unlawful possession of a firearm. *Bustamante-Davila*, 138 Wn.2d at 971, 974. Our Supreme Court held that Bustamante-Davila's consent to the officers' entry was valid without *Ferrier* warnings, reasoning that the INS agent and local law enforcement officers did not employ the knock and talk procedure deemed offensive in *Ferrier*, nor did the search exceed the scope of the consent. *Bustamante-Davila*, 138 Wn.2d at 982-83.

Our Supreme Court similarly upheld officers' warrantless entry into a home after receiving an apartment holder's consent based on the officers informing the apartment holder that they wished to enter to search for Harlan Williams, for whom they had an arrest warrant and who they reasonably suspected was at the apartment. *State v. Williams*, 142 Wn.2d 17, 27, 11 P.3d 714 (2000). The court held that *Ferrier* warnings were not required under these circumstances. *Williams*, 142 Wn.2d at 27. The court noted that, in *Bustamante-Davila*, it had "recently limited *Ferrier* to the kind of coercive searches the police employed [in *Ferrier*.]" *Williams*, 142 Wn.2d at 26. The officers' suspicion that Williams was at the apartment was reasonable because the officers "first verified the accuracy of an informant's statement [that the defendant was residing in a particular apartment] and identified the defendant's vehicle in front of [that] apartment." *Williams*, 142 Wn.2d at 27. Thus, the search in *Williams* did "not resemble a 'knock and talk' warrantless search that *Ferrier* intended to prevent." 142 Wn.2d at 27.

Finally, in *Khounvichai*, our Supreme Court held that *Ferrier* warnings were not required where officers sought entry for the legitimate investigatory purpose of questioning an occupant about an alleged offense. 149 Wn.2d at 566. In that case, two officers responded to a malicious mischief report at an address the complainant provided. *Khounvichai*, 149 Wn.2d at 559. The officers knocked on the door, and when a woman answered, they asked her whether the suspect was home. *Khounvichai*, 149 Wn.2d at 559. She told the officers that the suspect was her grandson and that he was at home, and the officers asked if they could enter to question him. *Khounvichai*, 149 Wn.2d at 559. She allowed the officers to enter, and one officer followed her to a room that smelled of marijuana. *Khounvichai*, 149 Wn.2d at 560. The suspect stepped out of the room and, when he saw the officer, turned and whispered to two other individuals in the room. *Khounvichai*, 149 Wn.2d at 560. One of those individuals, Khounvichai, quickly moved

across the room and out of the officer's sight. *Khounvichai*, 149 Wn.2d at 560. Concerned that Khounvichai was reaching for a weapon, the officer grabbed his hand and a baggie of cocaine fell out. *Khounvichai*, 149 Wn.2d at 560. In affirming the trial court's denial of Khounvichai's suppression motion, our Supreme Court reiterated that *Ferrier* only applies where the police employ coercive procedures to obtain consent to search a home and not where officers request entry for a legitimate investigatory purpose. *Khounvichai*, 149 Wn.2d at 566.

The State contends that these cases stand for the proposition that *Ferrier* warnings are only required where police employ the specific knock and talk procedure deemed offensive in *Ferrier*. In deciding this case, we need not determine the validity of this proposition and decide only the question presented here, which is whether police must give *Ferrier* warnings when asking for entry to search for a person the police reasonably suspect is on the premises.

We hold that where police obtain consent to enter and search a home for a person after informing the home's occupant of the purpose of the search and where the search is supported by a reasonable suspicion that the person may be found in the home, the police need not advise the occupant that she may refuse or limit entry or the subsequent search.

Here, police obtained consent to search Dancer's home for Johnson, a crime suspect, based on a reasonable suspicion that Johnson was in Dancer's home: the victim stated that the children might be there, Dancer confirmed that the children were there, and the K-9 unit led the officers to Dancer's house. As in *Khounvichai*, the officers sought entry for a legitimate investigatory purpose and did not employ deception or coercion akin to that deemed offensive in *Ferrier*. Accordingly, under these circumstances, officers were not required to provide *Ferrier* warnings, and we affirm the trial court's denial of Dancer's suppression motion.

III.    VOLUNTARY CONSENT TO WARRANTLESS SEARCH

Dancer next argues that even if *Ferrier* warnings were not required, the trial court erred because the record does not demonstrate that she voluntarily consented to police entry. Because there is substantial evidence that Dancer freely and voluntarily consented to police entry, we affirm the trial court. Beyond Dancer's actual consent to allow Elton to enter her home, we also hold that she voluntarily consented to allow the police to search her home for Johnson, including her locked bedroom where the methamphetamine was found.

A warrantless search is unreasonable per se under the Fourth Amendment and article I, section 7 unless an exception applies. *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000). Consent constitutes one exception to the warrant requirement. *State v. Holmes*, 108 Wn. App. 511, 516, 31 P.3d 716 (2001). To be valid, consent must be freely and voluntarily given. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). Any search consented to may not exceed the scope of the consent. *Bustamante-Davila*, 138 Wn.2d at 982.

Whether consent is free and voluntary is a question of fact determined by the totality of the circumstances, including (1) whether police gave *Miranda* warnings before obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the police advised the consenting person of his right to refuse consent. *State v. Reichenbach*, 153 Wn.2d 126, 132, 101 P.3d 80 (2004). No one factor is dispositive, *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990), and other factors may be considered, including whether the person was cooperative or refused consent before granting consent, *State v. Flowers*, 57 Wn. App. 636, 645, 789 P.2d 333 (1990), whether law enforcement had to repeatedly request consent, *O'Neill*, 148 Wn.2d at 589, and whether the defendant was restrained, *O'Neill*, 148 Wn.2d at 589.

Here, Dancer freely and voluntarily consented to the search for Johnson, and Elton did not exceed the scope of her consent. Elton asked permission to enter a locked bedroom after Dancer gave him permission to enter her home and search for Johnson. Dancer consented and unlocked the door. In the bedroom, Elton saw a glass methamphetamine pipe and baggies of methamphetamine in plain sight.

Police did not give Dancer *Miranda* warnings nor did they advise her of her right to refuse consent to their entry, their search for Johnson, or their request to unlock the bedroom door. But because Dancer was never in police custody or suspected of any crime, there was no reason for police to issue *Miranda* warnings or advise Dancer of her right to refuse consent. *See* *O'Neill*, 148 Wn.2d at 588 (knowledge of the right to refuse consent is not a prerequisite of voluntary consent when the subject is not in police custody).

Although police did not specifically ascertain the level of Dancer's education, Elton testified that he had numerous prior experiences with individuals unable to consent and that nothing about this situation indicated to him that Dancer was unable to provide voluntary consent. Specifically, Elton testified that "nothing [was] out of the ordinary" and that the "contact was appropriate." Report of Proceeding at 37. He also testified that he did not coerce or threaten Dancer. Additionally, the record establishes that Dancer was cooperative during the entire interaction and nothing suggests that she ever refused consent or that Elton repeatedly requested consent.

Because the trial court reasonably concluded from the totality of the circumstances that Dancer's consent was free and voluntary and that the scope of her consent extended to the search of the locked bedroom, we affirm.

Penoyar, J.

We concur:

Quinn-Brintnall, J.

Van Deren, J.